**IT IS SO RECOMMENDED** this 5th day of November, 2014.

Yolonda SMITH, Plaintiff,

v.

COX ENTERPRISES, INC. as Administrator of the Cox Enterprises, Inc. Long Term Disability Plan, Defendant.

Civil Action No. 1:13–cv–00834–TCB.

United States District Court, N.D. Georgia, Atlanta Division.

Signed Jan. 27, 2015.

William Phillips Tinkler, Jr., William Tinkler Jr., Attorney at Law, P.C., Decatur, GA, for Plaintiff.

Elizabeth Johnson Bondurant, Nikole Marie Crow, Womble Carlyle Sandridge & Rice, LLP, Atlanta, GA, Kenton Jones Coppage, Smith, Moore, Leatherwood, LLP, Atlanta, GA, for Defendant.

## ORDER

TIMOTHY C. BATTEN, SR., District Judge.

This case is before the Court on the parties' cross-motions for summary judgment [7, 9]. For the reasons set forth below, Defendant Cox Enterprises, Inc.'s motion will be granted.

## I. Background

### A. The Long–Term Disability Benefit Plan

Plaintiff Yolonda Smith seeks to recover long-term disability benefits under Cox's employee welfare benefit plan. The plan is administered by Aetna Life Insurance Company, and decisions pursuant to the policy are governed by the Employee Re-

tirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* The plan provides, in pertinent part:

> You are considered totally disabled while either of the following applies to you:
>
> - In the first 24 months of a period of total disability: You are not able, solely because of injury or disease, to work at your own occupation.
> - After the first 24 months of a period of disability: You are not able, solely because of injury or disease, to work at any reasonable occupation. (A reasonable occupation is defined as any gainful activity which you are or reasonably could become qualified to perform through education, training or experience earning equal to your LTD [ (Long Term Disability) ] benefit but no less than 60 percent of pre-disability earnings. It does not include work under an approved rehabilitation program).

Cox Summary Plan Description, p. 86.[7–2].

Aetna, as the administrator of the plan, has the discretionary authority to interpret its terms and to make eligibility determinations. The plan expressly provides:

> In accordance with Section 503 of Title I of [ERISA], AEtna Life Insurance ("AEtna") is hereby designated as the Named Fiduciary under the Cox Enterprises Group Insurance Plans ("Plan") with complete authority to review all denied claims for benefits under the Plan's Contract No. 050398.... In exercising its fiduciary responsibility, AEtna shall have the discretionary authority to determine, subject to the terms of the Plan, whether and to what extent partic-

> ipants and beneficiaries are entitled to benefits, and to construe disputes or doubtful Plan terms. AEtna shall be deemed to have properly exercised such authority unless it has abused its discretion hereunder by acting arbitrarily and capriciously.

Administrative Services Contract. [7–3] at 19. Smith does not dispute that Aetna held discretionary authority to review and determine claims for long-term disability.

### B. Smith's Position: Human Resources Analyst

Smith was employed by Cox at the Atlanta Journal Constitution as an HRIS Analyst, also known as a Human Resources Specialist. A detailed job analysis form, completed by Cox in connection with Smith's claim, describes her job duties as follows:

> Maintains and verifies the data integrity of the AJC Human Resources systems with a high degree of confidentiality. Enters data accurately, runs system interfaces, and creates/generates reports using report writing software. Identifies and recommends solutions for process improvement using existing technology thereby increasing efficiencies. Assists with system testing for new releases, enhancements and hardware changes, as well as analyzing results. Works closely with other staff, departments, and Vendors in order to obtain user ids, troubleshoot various issues, and provide HR Systems end-user training. Provides operational support to the benefits and payroll areas as assigned.

Administrative Record at 122.[1] According to the work history form submitted by Smith herself, she was "responsible for reports for the company [and] also main-

---

1. All factual citations made by the parties are to the Administrative Record, which is attached as Exhibit 4 to Aetna's motion for summary judgment [7]. For ease of reference, the Court's factual citations will also match the pagination of the Administrative Record.

tain[ing] org[anizational] structure." *Id.* at 182. The job analysis form indicates that Smith's position required her to work eight hours per day, of which seven required sitting, half an hour involved walking, and the remaining half hour involved standing. No kneeling, squatting, climbing, pushing, pulling or overhead work was required.[2]

## II. Aetna's Review of Smith's Claims

In 2005, Smith was diagnosed with Meniere's disease vestibular,[3] hypoactive labyrinth, and dizziness, which caused episodes of vertigo, headaches, and often nausea and vomiting. On April 22, 2011, Smith stopped working for Cox and applied for short-term disability benefits. In May 2011, Aetna denied her claim. On appeal in October 2011, Aetna affirmed that denial. In January 2012, she applied for long-term disability, and on April 16, Aetna denied that claim as well. Smith administratively appealed, and in October 2012 Aetna again affirmed its decision. Smith then filed this action, challenging the long-term disability denial. Because Smith filed her claims for short-term and long-term disability in short sequence, and because the medical documentation reviewed in both proceedings overlaps substantially, the Court will address below the substance of all medical documentation received and reviewed by Aetna from 2010 through 2012.

## A. Smith's Short–Term Disability Claim

After leaving work in April 2011, Smith submitted a claim for short-term disability. During the claims process, Aetna received records and reports from Smith's two treating physicians, otolaryngologist Dr. Fermin Stewart, and neurologist Dr. Michele Harvey.

### 1. Summary of Dr. Stewart's Attending Physician Records (Otolaryngology)

Dr. Stewart appears to have treated Smith from January 2006 through 2012. *See · id.* at 199 (office visit dates for the patient are listed as January 9, 2006 through January 2012). His first submission to Aetna was a Form WH–380–E,[4] in connection with an initial request by Smith in March 2010 for leave under the Family and Medical Leave Act. Dr. Stewart identified her diagnoses at that time as Meniere's disease with "dizzy spells" and "syncope episodes." *Id.* at 125. He noted that during episodes of dizziness, it would be "impossible for [Smith] to drive or sometimes keep her balance." *Id.* at 126. He also indicated that he had referred Smith to Dr. Michele Harvey, a neurologist.

On April 18 and May 9, 2011, Dr. Stewart submitted nearly identical attending physician statements, in which he confirmed Smith's diagnosis of Meniere's disease and listed her symptoms as "dizzy, vertigo." *Id.* at 132, 135. Dr. Stewart

**2.** These vocational descriptions are generally consistent with Human Resource Specialist positions, as defined by the Bureau of Labor Statistics and the U.S. Department of Labor, Employment and Training Administration. *See* Summary Report, Human Resources Specialist, 13–1071.00, *available at* http://www.onetonline.org/link/summary/13–1071.00.

**3.** Meniere's disease is an inner ear disorder that causes spontaneous episodes of vertigo along with fluctuating hearing loss, ringing in the ear (tinnitus), and sometimes a feeling of

fullness or pressure in the ear. The disease is linked to an excess of fluid in the inner ear and in many cases, symptoms are felt in only one ear. The severity, frequency and duration of these symptoms can vary. The disease is considered a chronic condition, though various treatment plans can help relieve symptoms.

**4.** Form WH–380–E is a Certification of Health Care Provider for Employee's Severe Health Condition, issued by the U.S. Department of Labor, Wage and Hour Division.

went on to state in a handwritten note on the attending physician statement forms that "patient should be on total disability." *Id.*

Aetna also received and reviewed clinical records from Dr. Stewart dated March 30, May 18, May 20, June 29, and October 3, 2011. In his March 30 medical notes, Dr. Stewart states that "[Smith] reports episodes of imbalance. . . . She continues to be fearful of laying back or turning quickly as this would sometimes induce a brief sensation of dizziness. Her symptoms are occasionally associated with nausea. She does not report a significant deterioration in her hearing." *Id.* at 204. His physical examination on that date led to the following observations:

> The membrane of right is intact. There's no significant retraction. No fluid is noted in the middle ear space. A pressure equalizing tube is in place and patent in the left tympanic membrane. No fluid is noted in the middle ear space. The nose has boggy inferior turbinates. The posterior pharyngeal wall has clear, thick phlegm. No significant cervical adenopathy is found to inspection on palpation. No observable cranial nerve weakness is appreciated.

*Id.*

On May 18, he noted that Smith still complained of "periodic muffling of the hearing with pressure and periods of increased tinnitus" but "no drainage from the ears [was] reported." *Id.* at 206. He did state that at that time, Smith's episodes of vertigo were associated with "extreme nausea and sometimes vomiting and/or diarrhea," but observed that she was able to successfully perform a Romberg test (a physical exam of neurological function, positioning, and balance) and that

Hall–Pike testing did not reveal nystagmus.[5]

On May 20, Dr. Stewart sent a letter to Aetna (addressed "To Whom It May Concern") in which he stated that Smith "suffers from intermittent episodes of incapacitating vertigo consistent with Meniere's disease." Though he did not indicate how frequently she experienced symptoms, he did note that when symptoms occur, they "still appear to significantly interfere with her ability to function." *Id.* at 202. Dr. Stewart's May 20, 2011 letter to Aetna, addressed "To Whom It May Concern," states in its entirety:

> This patient suffers from intermittent episodes of incapacitating vertigo consistent with Meniere's disease. She had had testing in the past which shows a hypofunctioning left labyrinthine system and has been evaluated with imaging studies. She has been managed with the traditional low-salt diet and diuretic with limited success. Management of eustachian tube function has also been addressed and have improved her symptom frequency. When symptoms do occur they still appear to significantly interfere with her ability to function. Her hearing continues to restrict her options with respect to surgical intervention.

*Id.*

Finally, in June 2011, Dr. Stewart again noted that Smith was suffering from "randomly recurring episodes of vertigo" and "occasional tinnitus." *Id.* at 203. She reported "occasional episodes of pressure in the ears," but he observed no drainage from the ears, and she had no significant sinus complaints. Similar to his earlier examinations, he observed clear thick phlegm at the posterior pharyngeal wall

---

**5.** Nystagmus is a condition of involuntary eye movement and is generally either optokinetic (eye related) or vestibular (inner ear related).

and mild retraction of the tympanic membrane, but no ulceration, no fluid in the inner ear, no significant adenopathy, no nystagmus, and Romberg testing was within normal limits. *Id.*

## 2. Summary of Dr. Harvey's Attending Physician Records (Neurology)

Dr. Harvey treated Smith from August 2009 through May 2011. On March 29, 2010, Dr. Harvey also submitted a Form WH–380–E, outlining Smith's relevant medical condition. She noted that Smith's condition is "life-long" and that she may or may not be able to completely control the condition with medication. Dr. Harvey went on to say that "[Smith] can perform her job duties except during the episodes of loss of consciousness." *Id.* at 129. Dr. Harvey opined that Smith may suffer flare-ups roughly once every two weeks, lasting from two to five days. *Id.* at 130.

On May 27, 2011, Dr. Harvey submitted an attending physician statement, in which she noted that Smith suffered from complicated migraines, vertigo, and syncope, which were being treated with Depakote and Valium. *Id.* at 139. Despite indicating that Smith suffered from frequent severe daily headaches, Dr. Harvey stated that she expected Smith to return to work in August of that year, and that she could perform "full duty," including sitting, keying a computer, grasping, repetitive motions, and reaching on a continuous basis. *Id.* She also indicated that at the time, Smith was capable of lifting ten to twenty pounds. The only express restriction and limitation in Dr. Harvey's attending physician statement was "no climbing." *Id.*

Aetna also received and reviewed a medical record from Dr. Harvey, dated May 26, 2011. Smith visited Dr. Harvey because of ongoing headaches and vertigo, as evidenced by her reports to Dr. Harvey that "[s]he passed out [three] times last week, once the week before [last], and none this week." *Id.* at 140. Upon physical exam, Dr. Harvey noted that Smith was negative for any substantial head, eyes, ears, nose and throat ("HEENT") presentations but was positive for dizziness and headaches. *See generally id.* at 141 (review of patient symptoms was negative for all HEENT disorders, including dysphagia, ear drainage or infection, fullness in ears, hearing loss, pharyngitis, tinnitus, and nystagmus). Dr. Harvey opined that she "highly suspect[ed] that the syncopal episodes and the vertigo [were] in part due to complicated migraine." *Id.* at 142.

Having reviewed the claim forms and medical reports from Dr. Stewart, Aetna concluded that the clinical documentation submitted by Smith's physician did not support a finding of continuous disability from performing her sedentary occupation. Thus, Smith's short-term disability claim was initially denied on May 17, 2011 and again on May 27.[6] In September, Smith appealed this determination.

## B. Appeal of Short–Term Disability Denial

In October 2011, as a part of its appellate review, Aetna asked Dr. Lawrence Burns, a board certified otolaryngologist, as well as Dr. Vaughn Cohan, a board certified neurologist, to provide independent reviews of Smith's medical records.

---

**6.** Aetna initially denied Smith's claim on May 17, 2011. At the time, it had only received records from Dr. Stewart covering the period from 2010 through April 2011. Aetna concluded that the information provided by him did not support an ongoing impairment. *Id.* at 302. Shortly thereafter, Aetna received additional documentation, including the May 2011 records from Dr. Harvey and Dr. Stewart, as well as his "To Whom It May Concern" letter. Aetna determined that this additional information was not sufficient to warrant a reversal of the claim decision. *Id.* at 305.

Each was asked to conduct a clinical review of Smith's medical file, that is, a "paper-review," as well as a peer-to-peer consultation via telephone with the appropriate treating physician.

### 1. Summary of Dr. Burns's Independent Physician Review and Report

Dr. Burns reviewed Dr. Stewart's medical notes from March 30, May 18, May 20, June 29, and October 3, 2011, as well as his attending physician statements. He also reviewed Dr. Harvey's attending physician statement and neurological progress notes from May 26, 2011. Additionally, he reviewed Smith's job description, Aetna's claim denial letters, and Smith's request for appeal. Dr. Burns noted that while Smith did suffer from episodes of imbalance, intermittent but incapacitating vertigo, and complaints of fluctuating fullness in the left ear, there were "no significant finding[s] listed in the record except for some clear phlegm in the posterior pharynx, and [a] Dix–Hallpike examination [that] led to no nystagmus." *Id.* at 152. Dr. Burns remarked that Smith had been treated with a tympanostomy in her left ear to treat the Meniere's disease, that the otological examination in March 2011 showed the tube to be open and clear, and that the medical notes from the relevant time period did not provide an indication of the frequency of her vertigo or the length of time that the episodes lasted.

In addition to his paper-review, Dr. Burns also conducted what is known as a peer-to-peer consultation with the claimant's treating physician. Dr. Burns contacted Dr. Stewart on October 24, 2011. During that conversation, Dr. Stewart indicated that Smith did not have any cognitive dysfunction, that her symptoms were consistent with some vestibulopathy, Meniere's disease and some positional vertigo, but that the symptoms tended to be either quite brief or less than a few hours, and occurred only once a week. *Id.* at 152. He stated that her symptoms continued to improve and that his "chief concern" at that time was the possibility that she might be injured on her way to work, were she to suffer from vertigo while driving. With regard to Smith's ability to work, he opined that she "would actually have no problem doing her work at home or at work if she could get a ride there." *Id.* at 153. Once at work, Dr. Stewart indicated that Smith should avoid suddenly turning her head to avoid positional vertigo, but otherwise he described no functional limitations on her ability to perform her job.

Dr. Burns generally agreed with this assessment and concluded that there was no significant support in either the medical chart history or in his consultation with Dr. Stewart that led to the conclusion that Smith could not perform the sedentary work required by her position.

### 2. Summary of Dr. Cohan's Independent Physician Review and Report

Dr. Cohan also reviewed Dr. Stewart's medical notes from March 30, May 18, May 20, June 29, and October 3, 2011, as well as Dr. Stewart's attending physician statements. Additionally, he reviewed Smith's job description, Aetna's claim denial letters and Smith's request for appeal. Dr. Cohan, a board certified neurologist, was asked to primarily evaluate Smith's neurological conditions. Dr. Stewart's medical notes describe Smith's otologic findings in detail, which Dr. Cohan summarized in his report. But those records did not provide a detailed description of neurological results. Dr. Cohan did state that, with regard to neurological assessments, Dr. Stewart observed that [Dix]-Hallpike testing did not reveal significant observable nystagmus and that Smith was

"able to perform a Romberg but has difficulty with tandem Romberg." *Id.* at 148.

Dr. Cohan attempted to reach Dr. Harvey by telephone, but because she had relocated, he was unable to speak with her. For that reason, Dr. Cohan's neurological review was based on the paper records alone, including Dr. Harvey's attending physician statement and her progress notes from May 26, 2011.[7] Dr. Cohan noted that Smith had been in the care of Dr. Harvey for vertigo and episodic headaches, having passed out several times. Dr. Harvey, he comments, suspected that the syncopal episodes and vertigo were due, at least in part, to complicated migraine. Dr. Harvey's May 2011 medical notes, however, did not describe in any detail the characteristics of Smith's headaches, their history, previous treatment plans or responses to treatment.[8] Nor did Dr. Harvey provide a detailed description of Smith's apparent losses of consciousness or associated systemic and neurological symptoms. Dr. Cohan therefore concluded that while Smith likely suffered from vertigo, chronic headaches, and suspected Meniere's syndrome, the neurological documentation did not demonstrate objective evidence of a functional impairment. Dr. Cohan deferred review of the otolaryngology reports to Dr. Burns, the appropriate specialist, but because Dr. Harvey's neurological records did not indicate the severity, intensity or frequency of Smith's headaches, and there was no evidence of intractable nausea or vomiting or urgent visits for analgesic therapy, Dr. Cohan concluded that there was insufficient evidence of a functional impairment from Smith's sedentary occupation. *Id.* at 149.

Based on the medical documentation provided and the independent reviews by Drs. Burns and Cohan, Aetna determined that Smith's restrictions and limitations did not prevent her from performing sedentary work. According to Aetna, "there was a lack of medical evidence to support [Smith's] inability to perform the essential functions of her own occupation, effective April 25, 2011." *Id.* at 41. Because the claim was not medically supported, Aetna informed Smith in November 2011 that her appeal had been denied.

### C. Long–Term Disability Claim

In January 2012, Smith submitted a claim for long-term disability. The claim was effectively submitted with duplicate records from the short-term disability claim, along with some additional medical records dated December 8, 2005, March 22, 2010, and January 4, 2012. Smith also spoke with Aetna to provide additional detail on her claim. She indicated that her vertigo, nausea and dizziness could be triggered by certain smells, staring at ceiling fans, escalators, and moving cars. She explained that she had passed out on at least one occasion and that though she did drive, she was fearful when doing so and was required to pull over if she began to have an attack. At the time, she stated that she was being treated with Diazepam. *Id.* at 16. She indicated that she could do daily household cleaning and chores and use a personal computer, but that she

---

7. Dr. Cohan advised Aetna that he had been unable to consult directly with Dr. Harvey. He was therefore asked to complete his peer review "based on the limited medical documentation provided by Neurology." *Id.* at 149.

8. Dr. Cohan does recite Smith's relevant prescription history, including a daily dosage of Verapamil, which Dr. Harvey discontinued, the initiation of Depakote, and Zyrtec or Claritin for possible allergies. But he notes that Smith did not appear to have been treated with migraine rescue therapy or a triptan agent.

could not wear her bi-focal glasses while operating the computer, because they triggered an attack.

On January 19, 2012, Dr. Stewart submitted a new attending physician statement, additional medical notes from a more recent physical examination, March 2010 audiology test data,[9] and a completed Capabilities and Limitations Worksheet. Dr. Stewart noted on the updated attending physician statement form that "for medical reasons, [Smith] will need to be absent from work due to a disability beginning *04/18/11* and ending on *unknown*," and that her symptoms continued to consist of "dizziness, vertigo, imbalanced, headaches, [and] migraines." *Id.* at 199–200. Regarding Smith's prognosis for work, Dr. Stewart remarked on the attending physician statement that she was able to do "sedentary work activity."[10] On the Capabilities and Limitations Worksheet he indicated that Smith was capable of sedentary work for eight hours a day, five days a week. The only limitations he noted were: no climbing, crawling, kneeling, pulling, pushing, bending, twisting, stooping, no neck and head movements, and no lifting greater than twenty pounds. *Id.* at 198–99. Dr. Stewart also noted that Smith was capable of driving, but not on highways. *Id.* at 201.

Dr. Stewart's updated medical records also included notes from an office visit on January 4, just days before he completed the requested attending physician statement and Capabilities and Limitations Worksheet for Aetna. His office notes indicate that Smith continued to report mild episodes of spinning once a week, but without nausea or vomiting. *Id.* at 172 ("The patient continues to have episodes of spinning although mild, about once per week. No nausea and vomiting associated."). Despite occasional pressure in the ear, her hearing continued to be good in both ears, no fluid was detected in the middle ear, and no adenopathy was identified. He observed that Smith was "still reluctant to make correct movements as she feels this makes her have a dizzy sensation, although only a few seconds." *Id.*

Aetna's in-house nurse consultant, Julie Ballas, reviewed the long-term disability claim, including the information previously submitted in connection with the short-term disability claim, and the additional documentation submitted by Dr. Stewart

---

9. The March 22, 2010 record is a VNG Data Analysis Report, prescribed by Dr. Stewart and performed by audiologist Kelly Calkins. The report notes "normal saccades," "abnormal smooth pursuit," "no nystagmus" and "a clinically significant left unilateral weakness...." The overall clinical impression provided in the audiology report states:

Patient characterized her dizziness as attacks lasting 3 to 4 hours in duration that first appeared 5 years ago. Patient described a sensation of lightheadedness, blurred vision, double vision and room spinning when episodic. She stated she does become dizzy when she changes positions and that she loses her balance when walking in the light and dark. Patient has experienced nausea, blackouts and a feeling of pressure in her head. Patient com-

plained of fluctuating hearing loss, and aural fullness, tinnitus, and pain in her left ear. Patient has history of Migraine headaches. A left unilateral weakness during calorics indicates a lesion involving the lateral semicircular canal or its afferent neural pathways in the left ear. Abnormal Oculomotor results indicate CNS involvement and possibly a weakened VOR. Patient has been previously diagnosed with Meniere's disease. *Id.* at 208.

10. The attending physician statement form defines sedentary work activity as "moderate limitation of functional capacity. Exerting up to 10 pounds of force occasionally. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time." *Id.* at 200.

in January 2012. Ballas concluded that Smith was capable of full-time, sedentary work. *Id.* at 31.

On April 16, 2012, Aetna denied Smith's long-term disability claim. *Id.* at 69. The denial letter advised Smith that she was entitled to reconsideration of the decision and that Aetna would review any additional information that she might seek to admit, including additional medical records, diagnostic studies, and narrative reports outlining her physical or mental limitations.

### D. Appeal of Long–Term Disability Denial

On August 29, 2012, Smith appealed the decision. In support, she provided three letters from former supervisors.[11] She provided no additional medical information.

### 1. Summary of Dr. Ross Clark's Independent Physician Review and Report

In October 2012, as part of its review on appeal, Aetna engaged Dr. Ross Clark to conduct an independent review of Smith's long-term disability claim. Dr. Clark, a board certified otolaryngologist, reviewed Smith's entire file, including all of the previously discussed records from Drs. Stewart and Harvey, Smith's prior claim forms (including denial letters and appeal requests), job analysis information, previous independent peer-review reports, and the three letters from Smith's co-workers.

Dr. Clark's report acknowledged that Smith had suffered from disequilibrium and migraine headaches for years. *Id.* at 115. He summarized Smith's medical treatment at that time, stating that she had received a ventilation tube in her left ear, was placed on a low dose of Valium and Hydrochlorothiazide, and maintained a low-salt diet, all of which had led to some decrease in symptoms. Her physical examinations had revealed normal neurological functioning, normal Dix–Hallpike testing, and an absence of nystagmus. He reviewed the updated medical information from Smith's most recent visit to Dr. Stewart, in January 2012, during which she complained of mild spinning sensations once a week with no nausea or vomiting and Dr. Stewart concluded that the ear ventilation tube was functioning within normal limits.

Like Dr. Burns before him, Dr. Clark also conducted a peer-to-peer consultation with Dr. Stewart. Dr. Clark's notes from his telephone discussion with Dr. Stewart on October 11, 2012 are relatively short, but they generally indicate that Smith's most recent audiometric testing was within normal limits, that her hearing was symmetrical in both ears, and that there was

---

11. The letters were submitted by the following individuals: Dana Bradley, who worked at Smith's employer from 2004 to 2006 and attests to her struggle with vertigo ("There were days when Ms. Smith reported to work at the onset and/or conclusion of her [vertigo] episodes. During these times, her energy and productivity were negatively impacted. Oftentimes, she, at best, would remain in her cube, propping her head up while completing her daily tasks."); Allene G. Williams, who does not state the years during which she worked with Smith but writes regarding a fall at work and accommodations that were granted ("[Smith] was in the copy room on one occasion and became dizzy enough to fall and hit her head ... and' when the office moved from downtown to Dunwoody accommodations were made for her based on her doctors limiting her driving ... the accommodation was to approve for her to work from a branch office near her home...."); and Karen D. Walker, who worked at Smith's employer from 1997 to 2008 and reports her struggles with vertigo ("She experienced constant struggles with Vertigo and fell several times on AJC property. Her illness would flare up without notice, sending [her] on a downward spiral physically and emotionally."). *Id.* at 162–64.

no specific record of Smith's ability to operate a motor vehicle.[12]

Based on his review of the medical records and his telephone conversation with Dr. Stewart, Dr. Clark concluded that there was insufficient information to support a functional impairment and that Smith could perform sedentary to medium work with no difficulty. He opined that she would be limited from operating heavy machinery, working at heights, or climbing ladders. But none of these restrictions would affect her ability to perform her sedentary position at Cox.

On October 30, 2012, Aetna upheld its denial of Smith's claim for long-term disability. Smith then sought relief in this Court.

### III. Legal Standard

#### A. Summary Judgment in ERISA Actions

■ Under Federal Rule of Civil Procedure 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). But "in an ERISA benefit denial case ... in a very real sense, the district court sits more as an appellate tribunal than as a trial court. It does not take evidence, but rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." *Curran v. Kemper Nat'l Servs., Inc.,* No. 04–14097, 2005 WL 894840, at *7 (11th Cir. March 16, 2005) (quoting *Leahy v. Raytheon Co.,* 315 F.3d 11, 17–18 (1st Cir. 2002)); *see also Howard v. Hartford Life & Accident Ins. Co.,* 929 F.Supp.2d 1264, 1286 (M.D.Fla.2013); *Harvey v. Standard Ins. Co.,* 850 F.Supp.2d 1269, 1275 n. 5 (N.D.Ala.2012), *aff'd, Harvey v. Standard Ins. Co.,* 503 Fed.Appx. 845 (11th Cir. 2013). An administrator's decision is therefore reviewed for abuse of discretion. "[A] motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exist, do not apply." *Howard,* 929 F.Supp.2d at 1286 (quoting *Crume v. Metro. Life Ins. Co.,* 417 F.Supp.2d 1258, 1272 (M.D.Fla.2006)).

In a case like this, where the ultimate issue to be determined is whether there is a reasonable basis for a claims administrator's benefits decision, it is difficult to ascertain how the "normal" summary judgment rules can sensibly apply. After all, the pertinent question is not whether the claimant is truly disabled, but whether there is a reasonable basis in the record to support the administrator's decision on that point. In other words, conflicting evidence on the question of disability cannot alone create an issue of fact precluding summary judgment, since an administrator's decision that rejects certain evidence and credits conflicting proof may nevertheless be reasonable.

*Crume,* 417 F.Supp.2d at 1272. The Court will therefore review this case using the modified Rule 56 standard set forth in *Curran* and *Crume.*

---

12. Dr. Clark's peer-to-peer consultation notes state:

On 10/11/12 .... The treating otolaryngologist, Dr. Stewart, was contacted by via phone. He stated the last visit with the claimant was in January of 2012. He reviewed his audiometric testing and it was essentially normal with a slight loss in the low frequencies. The hearing was essentially symmetrical in both ears. I asked if the claimant was driving at this time. He had no specific record of her ability to operate a motor vehicle.

*Id.* at 115.

## B. Review of the Benefits Decision

 Although ERISA does not provide a standard for reviewing a denial of benefits, the Eleventh Circuit has provided a six-step framework to guide examining courts. *Blankenship v. Metro. Life Ins. Co.,* 644 F.3d 1350, 1354 (11th Cir.2011), *cert. denied,* — U.S. —, 132 S.Ct. 849, 181 L.Ed.2d 549 (2011); *see Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105, 128, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008); *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). The steps are:

(1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if

he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship,* 644 F.3d at 1355 (citing *Capone v. Aetna Life Ins. Co.,* 592 F.3d 1189, 1195 (11th Cir.2010)).

Because Smith concedes that Aetna is vested with the discretionary authority to review long-term disability claims such as Smith's, and that it did not act under any conflict of interest, the Court's inquiry concerns only whether the claim administrator's decision was de novo wrong and, if so, whether, under an arbitrary and capricious standard, there were reasonable grounds to support it.[13]

## IV. Discussion

### A. The Decision Was Not De Novo Wrong

 Under the Eleventh Circuit's framework, the Court must first determine whether Aetna's decision to deny benefits was de novo wrong. In making this determination, the Court "stand[s] in the shoes of [Aetna] and starts from scratch, examining all the evidence before [Aetna] as if the issue had not been decided previously." *Stiltz v. Metro. Life Ins. Co.,* No. 1:05–cv–3052–TWT, 2006 WL 2534406, at *6 (N.D.Ga. Aug. 30, 2006), *aff'd,* 244 Fed. Appx. 260 (11th Cir.2007). The Court is

---

**13.** "A denial of benefits under an ERISA plan must be reviewed de novo unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Lee v. Blue Cross/Blue Shield of Ala.,* 10 F.3d 1547, 1549 (11th Cir.1994) (quoting *Bruch,* 489 U.S. at 115, 109 S.Ct. 948). Where a benefits plan gives such discretion to the administrator, the Court reviews the denial of benefits under an arbitrary and capricious standard. *Id.*

"limited to consideration of the material available to the administrator at the time it made its decision." *Id.* (citing *Jett v. Blue Cross & Blue Shield of Ala., Inc.,* 890 F.2d 1137, 1140 (11th Cir.1989)). The Court acts as a fact-finder, "reviewing the evidence and making a determination on its own as to whether [the claimant] is entitled to disability benefits." *Bates v. Metro. Life Ins. Co.,* Civ. Action No. 5:08–CV–22 (CAR), 2009 WL 2355834, at *10 (M.D.Ga. July 27, 2009). If the Court finds, by a preponderance of the evidence, that Smith is entitled to benefits, then the decision was de novo wrong. *See Niles v. Am. Airlines, Inc.,* 269 Fed.Appx. 827, 833–34 (10th Cir.2008) (citing *Ray v. UNUM Life Ins. Co. of Am.,* 224 Fed. Appx. 772, 782 (10th Cir.2007); *Alexander v. Winthrop, Stimson, Putnam & Roberts Long Term Disability Coverage,* 497 F.Supp.2d 429, 440 (E.D.N.Y.2007)) (explaining that a decision is de novo wrong if it is contradicted by a preponderance of the evidence).

■■ After a thorough review of the administrative record, the Court cannot conclude that a denial of benefits was de novo wrong. The Court bases its conclusion on the lack of clinical evidence supporting Smith's claim. While it is clear that Smith suffers from Meniere's disease, migraines, vertigo, and hypoactive labyrinth, she failed to provide sufficient medical evidence that these conditions prevent her from performing her job. The burden in an ERISA case is on the claimant to establish her disability and her entitlement to benefits. *Horton v. Reliance Standard Life Ins. Co.,* 141 F.3d 1038, 1040 (11th Cir.1998) ("A plaintiff suing under [ERISA] bears the burden of proving his entitlement to contractual benefits"); *Brucks v. Coca–Cola Co.,* 391 F.Supp.2d 1193, 1204 n. 12 (N.D.Ga.2005) (the burden is "on the claimant to demonstrate [she] is

entitled to benefits under the plan, not on the administrator to demonstrate that the claimant is not disabled."). The record reflects only one audiology report from December 2005, more than six years prior to Smith's long-term disability claim, one VNG data analysis report from March 2010, and clinical notes from both her otolaryngologist and neurologist, none of which presents substantial objective evidence of long-term disability. Smith's symptoms are repeatedly reported by her, and described by her physicians, as intermittent and occasional, and treatment of her inner ear and Eustachian tube appears rather effective. While there are a few exceptional notes suggesting that Smith's symptoms can be extreme and incapacitating, other medical reports more contemporaneous with her long-term disability claim observe her hearing and perception in both ears to be good, her symptoms to be mild, an absence of nausea or vomiting, and dizzy sensations that last "only for a few seconds." Objective and diagnostic reports provide considerable support for a diagnosis of Meniere's disease and related vertigo, migraines and dizziness. But the preponderance of the medical records and statements from Smith's health care providers do not support the conclusion that her medical conditions are severe enough to support a finding of total disability. *Howard,* 929 F.Supp.2d at 1292 ("While the Court recognizes that [the claimant] suffers from an array of ongoing medical problems and chronic pain, the question presented . . . is whether her medical conditions are sufficiently work-preclusive to establish disability under the ERISA Plan."); *Stiltz,* at *10 ("disability under the terms of a disability plan is not established simply because there has been a medical diagnosis or because a claimant suffers pain"). Indeed, Smith claims to have been symptomatic and diagnosed with Meniere's disease in 2005, and yet she continued to

successfully work full-time for the next six years. Diagnosis alone cannot support a claim for long-term disability.

In support of her claim for long-term disability in 2012, Smith did not provide Aetna with any additional clinical documentation, contemporaneous ENG or VNG testing, or new diagnostic results that suggested she was unable to perform full-time, sedentary work. There was no up-to-date objective medical indication of the severity, frequency, or work-related incapacitation of Smith's disease. Indeed, the January 2012 documentation provided by Dr. Stewart, if anything, supports a denial of benefits.[14] Despite suffering from headaches, dizziness, episodes of vertigo and occasionally nausea, the notion that she would be unable to sit at a desk, key a computer, and avoid any sudden turning or spinning movements is unsubstantiated by medical reports. Her symptoms, based upon his office visit notes, actually appear to have dramatically improved. Dr. Stewart's January 4, 2012 office note states:

> This is a 51 years old female who returns regarding chronic problems with dizziness. The patient continues to have episodes of spinning, although mild, about once per week. No nausea and vomiting associated. The patient has occasional pressure in the ear. The patient's hearing continues to be good to her perception in both ears. The patient still has occasional episodes of near syncope. The ears were inspected with the operating microscope. No fluid is noted in the middle ear space. The pressure equalizing tube is in place in the left tympanic membrane. Inspection and palpation of the neck reveals no significant adenopathy. The patient is still reluctant to make correct movements as she feels that this makes her have a dizzy sensation, although only a few seconds.

Id. at 172. Nothing in this report contradicts his statements on the attending physician statement or Capabilities and Limitations Worksheet that she can perform sedentary work. Nor does the report objectively support the conclusion that Smith is incapable of performing her job.

In 2011, Drs. Stewart and Harvey submitted attending physician statements, medical records, and patient notes, and were given ample opportunity to express restrictions in Smith's ability to work. And yet both failed to objectively demonstrate relevant limitations. Smith's treating physicians consistently opined that she should not climb, push, pull, or operate heavy machinery—but they also consistently indicated that sedentary work, typing a computer, reaching, walking, and lifting ten to twenty pounds were within her physical and mental capacities.

Three independent physicians reviewed Smith's medical files and arrived at the same conclusion; the physical evidence, the historical diagnostic results, and the clinical notes of her treating physicians signaled the presence of vertigo, migraine headaches, and dizziness. But there was no indication that these presentations were consistently disabling or that Smith was incapable of functioning once she was at

---

14. The documentation provided by Dr. Stewart in January 2012 indicated that Smith could perform sedentary work activity eight hours a day, five days a week. Likewise, it specified that she could occasionally lift up to twenty pounds and could continuously sit or stand. Dr. Stewart did note that Smith continued to suffer from "intermittent episodes" of incapacitating vertigo and that when she was symptomatic, it significantly interfered with her ability to work. But this diagnosis aligns with all prior reports of Smith's presentations; her symptoms can be severe and incapacitating, but they are neither continuous nor wholly disabling.

work. The Court readily acknowledges the possibility that Smith does in fact suffer from such severe conditions that she is wholly incapable of working. But without sufficient objective evidence, test results and supporting medical opinions, the Court cannot conclude that Aetna's decision to deny Smith benefits was wrong.

But the Court need not have even undertaken a detailed analysis of whether it agrees or disagrees with Aetna's decision, because it is clear from the record that Aetna's denial of benefits was reasonable.[15] And a reasonable decision cannot be arbitrary and capricious. Smith's principal objection is that the medical review of her file, performed by three independent physicians, was insufficient and inexact. But even if Smith is correct that Aetna's denial of benefits was de novo wrong, the Court would remain bound to assess the reasonableness of the decision.

## B. Denial of Benefits Was Not Arbitrary and Capricious

■■ Assuming *arguendo* that Aetna's decision was de novo wrong, the Court finds that the denial was nevertheless reasonable. "In reviewing a termination of benefits under the arbitrary and capricious standard, the function of a reviewing court is to discern whether there was a reasonable basis for the decision, relying on the facts known to the administrator at the time the decision was made." *Buckley v. Metro. Life*, 115 F.3d 936, 941 (11th Cir. 1997). The standard for whether the determination was arbitrary and capricious is not the preponderance standard, but whether it was the product of a deliberate, principled reasoning process and supported by substantial evidence. *See Glenn*

*v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006), *aff'd, Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008). "As long as a reasonable basis appears for [Aetna's] decision, it must be upheld as not being arbitrary and capricious, even if there is evidence that would support a contrary decision." *White v. Coca–Cola Co.*, 542 F.3d 848, 856 (11th Cir.2008) (quoting *Jett*, 890 F.2d at 1140).

In support of her claim of permanent disability, Smith points to an early clinical notation that her symptoms were extreme and frequent, and to two notations made by her treating physician, one in the spring of 2011 that Smith "should be on total disability" and the second in January 2012, indicating that she might be out of work from April 2011 until "unknown." And while these statements could support the conclusion that she may be permanently disabled, the record also contains considerable contradictory evidence. Dr. Stewart himself supplied Aetna with documentation that is blatantly at odds with the contention that Smith is permanently disabled. Multiple medical notes, diagnostic reports, and peer consultations comport with the assessment and opinion of three independent physicians and Aetna's in-house nurse: that Smith is capable of performing full-time, sedentary work. These opinions were not baseless and Aetna's reliance on them was not misplaced.

Two independent physicians, Dr. Burns in October 2011 and Dr. Clark in October 2012, reviewed Smith's medical records and spoke directly with Dr. Stewart. Neither of their conversations with Dr. Stewart revealed any indication that Smith was incapable of performing her job. Indeed, Dr. Burns's notes state that Dr. Stewart

---

15. For such purposes, the Court may simply assume that the decision was de novo wrong. "[F]inding the Defendant's decision was reasonable, the Court will assume *arguendo* that

Defendant's decision was de novo wrong." *McInvale v. Metro. Life Ins. Co.*, Civ. Action No. 5:07–CV–459–HL, 2009 WL 2589521, *6 (M.D.Ga. Aug. 18, 2009).

told him: "[Smith] would have no problem doing her work at home or at work if she could get a ride there." *Id.* at 320. This directly contradicts any suggestions that Smith is completely incapable of working. Smith's medical records and the opinions of independent reviewing physicians provided a reasonable basis for Aetna's conclusion that Smith remained capable of performing her job.

■ For her part, Smith argues that Aetna's denial was unreasonable for four reasons.

*First,* Smith argues that denial was unreasonable because of what she perceives to be flaws in the independent reviews of Dr. Burns and Dr. Cohan. For example, Dr. Burns notes that Smith's vertigo began "sometime in the spring of 2011," despite the fact that other documentation suggests that her symptoms began as early as 2005. Or the fact that Dr. Cohan notes that there is limited detail on Smith's headache history, despite one March 2010 record (which he was not provided) that does indicate "severe complicated migraine between 2009 and 2010." But these minor inconsistencies or even instances of potential oversight are far too insignificant to question Aetna's reliance on their professional opinions. *See Howard,* 929 F.Supp.2d at 1297 (where reviewing healthcare providers did not receive every treating physician's report, reported inconsistent office visit dates, and did not see claimant's corrections to her explanation of conditions, these were not the type of irregularities that create procedural unreasonableness sufficient to recast [the insurer's] reliance upon the consulting professionals' opinions as being arbitrary and capricious.) (internal quotation omitted).

Smith also attempts on two occasions to mince the independent reviewing physician's words, but the Court finds her clinical distinctions to be trivial and, in any event, to likely have had little relevance to the ultimate determination on disability. Smith suggests that Dr. Burns misconstrues the meaning of "significant deterioration" in hearing versus "hearing loss."[16] Whether Smith had significant deterioration in her hearing or suffered from some hearing loss is certainly related to her Meniere's disease, hypoactive labyrinth, and severe episodes of vertigo. But it is not dispositive to a finding of disability. And if Smith's primary concern with Dr. Burns's 2011 evaluation is his apparent mischaracterization of Dr. Stewart's medical notes, then subsequent review in 2012 by Dr. Clark should alleviate those concerns. Dr. Clark was privy to the same medical records as Dr. Burns, as well as updated information provided by Dr. Stewart in January 2012. And like Dr. Burns before him, he conducted a phone consultation with Dr. Stewart, in which he expressly inquired about Smith's auditory history. In 2012, "[Dr. Stewart] reviewed his audiometric testing and it was essentially normal with a slight loss in the low frequencies. The hearing was essentially symmetrical in both ears." *Id.* at 115.

Smith also questions Dr. Cohan's distinction between "extreme" nausea and "intractable" nausea. Dr. Cohan concluded that Smith's bouts of nausea were not "intractable" despite the fact that Dr. Stewart did observe on one occasion in 2011 that her episodes of vertigo were associated with "extreme" nausea. There is no doubt from the record that Smith suffers from vertigo, which is often accom-

---

**16.** Dr. Stewart's March 30, 2011 clinical note states that Smith did "not report a significant deterioration in her hearing." Admin. Record at 204. Smith contends that Dr. Burns misread (or intentionally misstated) this record, which he summarized with the notation that "there was no hearing loss." *Id.* at 152.

panied by dizziness, nausea, and sometimes vomiting. And while the Court notes that there is in fact a difference between intractable (difficult to alleviate, remedy, or cure) [17] and extreme (of the greatest severity),[18] it is again unlikely that Aetna's disability determination rested on this distinction. It was not an abuse of discretion for Aetna to rely on Dr. Cohan's determination that Smith suffered from extreme symptoms due to her vertigo, but that those symptoms were intermittent, controllable and sufficiently sporadic that with treatment, she could continue to perform her sedentary job at Cox.

Smith also argues that Dr. Cohan's neurological review is fundamentally flawed because he is uninformed about a basic neurological test, based on clinical commentary he provided when reviewing Dr. Stewart's notes. Dr. Stewart stated on May 18, 2011 that "[Smith] was able to perform a Romberg but has difficulty with tandem Romberg." To which Dr. Cohan comments, "I am not certain as to the meaning of that latter remark." *Id.* at 148. Smith argues that this implies his ignorance as to the methods and indications of tandem Romberg testing. The Court is skeptical that Dr. Cohan, a board certified neurologist, is unfamiliar with tandem Romberg testing, a variation of the Romberg testing that calls for very similar implementation.[19] Dr. Stewart's note clearly reflects Smith's ability to perform a Romberg test, but difficulty with the tandem Romberg. "Difficulty" does not imply inability or failure, and more importantly, does not indicate the nature or degree of Smith's difficulty. An equally reasonable interpretation of Dr. Cohan's comment, therefore, is that he was unable to make a conclusive determination as to the import of Dr. Stewart's notation about the tandem Romberg testing. The Court finds no merit in these trivial distinctions drawn by Smith, none of which renders Aetna's reliance on the opinions of Dr. Cohan and Dr. Burns unreasonable.

*Second,* Smith argues that it was unreasonable for Aetna to base its denial of long-term disability benefits on a review of records generated a few months before in connection with Smith's claim for short-term disability benefits, specifically the reviews of Drs. Burns and Cohan. Those physicians conducted their independent reviews of Smith's medical records in October 2011. Smith's long-term disability claim followed in January 2012. Smith is correct that neither physician was asked to comment on the limited updated materials submitted by Dr. Stewart in January 2012. And had there been a material change in Smith's diagnosis, treatment, or prognosis between October 2011 and January 2012, the short-term disability assessments would no doubt be less significant, and perhaps wholly irrelevant. But the updated records from January 2012 are devoid of information that is likely to have

---

17. The American Heritage Dictionary of the English Language (5th Ed.2011), https://ahdictionary.com/word/search.html?q=intractable.

18. The American Heritage Dictionary of the English Language (5th Ed.2011), https://ahdictionary.com/word/search.html?q=extreme.

19. A Romberg test typically requires the patient to stand upright with her feet together (side by side) and hands either at their side or crossed in front. The observing physician asks the patient to close her eyes, examining whether the patient becomes unsteady with her eyes closed (swaying, moving, placing a foot out to balance, or even falling). The tandem Romberg is merely a variation on this test, where the patient instead places her feet in a heel-to-toe position (that is, one foot in front of the other). The patient is then asked to close her eyes and again, the same examination is performed.

changed Dr. Cohan's or Dr. Burns's recommendations. In fact, the only "new" information that Smith points to as relevant to the inquiry is the notation on Dr. Stewart's attending physician statement that Smith needed to be absent from work due to disability from April 18, 2011 (her last day of work) until "unknown." This notation is hardly a clear indication of permanent disability, particularly in light of the remaining contents of the form, which indicate that Smith could perform continuous, sedentary work on a full-time basis. The other supplemental documentation provided by Dr. Stewart in January 2012 does anything but support a finding of disability. Dr. Stewart's objective assessment indicates that Smith is capable of sedentary work, suffers from intermittent (though not wholly incapacitating) bouts of vertigo, and continues to have good hearing and perception in both ears. *Id.* at 160 ("Patient continues to have episodes of spinning, though mild, about once per week. No nausea and vomiting associated. [Patient] has occasional pressure in the ear . . . hearing continues to be good to her perception in both ears. . . . No fluid is noted in either middle ear space . . . no significant adenopathy."). If anything, this clinical note appears to confirm the prior opinions of Drs. Burns and Cohan.

The Court is therefore not persuaded that Aetna's reliance on the prior opinions of Drs. Burns and Cohan was inappropriate. But even if their opinions should have been treated as "stale" with respect to her claim for long-term disability, Aetna's engagement of Dr. Clark and its reliance on his opinion again renders these concerns moot. Dr. Clark undertook an independent review of Smith's file in October 2012, and with the benefit of the updated information provided between October 2011 and January 2012, he came to the same conclusion as all prior examiners:

Smith was physically capable of performing sedentary work on a full-time basis.

*Third,* Smith argues that Aetna's denial was unreasonable because Dr. Clark's review of the record reflects "glaring omissions," and his evaluation notes were unacceptably sparse. But the record reflects that Dr. Clark reviewed all of the records available to him in October 2012, including: Dr. Stewart's and Dr. Harvey's attending physician notes, statements and questionnaires; historical certification of Smith's serious health condition; previous peer-review reports by Dr. Burns and Dr. Cohan; work history documentation provided by both the employer and employee; and three letters from co-workers provided in August 2012.

Dr. Clark's report acknowledged that Smith had a history of disequilibrium, migraine headaches, fullness in the left ear, spinning sensations, and a hypoactive left labyrinth. His summary of her condition addresses her principal complaints, symptoms, and diagnoses. He explicitly references her years-long battle with headaches and disequilibrium, and her ongoing treatment by Dr. Stewart between 2011 and January 2012, just before filing her claim for long-term disability. Dr. Clark's independent review does not repeat or summarize the entirety of Smith's file, nor does it reference and clarify every medical note and diagnostic report. Nor must it. Dr. Clark clearly reviewed the record, highlighted relevant and material portions covering the period of alleged disability beginning in 2011, conducted a telephone consultation with Dr. Stewart, and came to the conclusion that there was insufficient information to support a finding of functional impairment. He noted that her physical evaluations had been within normal limits, that there was no evidence of nystagmus, and that neurological examinations resulted in normal Dix–Hallpike re-

sults. Based on all of the information provided, along with his telephone consultation with Dr. Stewart, Dr. Clark concluded that there was insufficient information to support functional impairment. He concluded that Dr. Stewart's 2011 notation that Smith should be on total disability was simply not supported by physical findings in the record. There is no evidence that his opinion was patently wrong, nor was it unreasonable for Aetna to rely on it.

*Fourth,* and finally, Smith accuses Aetna of "cherry-picking" from the administrative record, relying on statements that support their denial of benefits while ignoring opinions that might suggest Smith is incapable of performing her former job. But there is no indication that Aetna ignored significant portions of the medical data or that it selectively reviewed only evidence that supported a denial of benefits. In fact, Aetna representatives, as well as three independent reviewers, expressly recognized that Smith's treating physician appeared to believe that serious restrictions should be placed on her ability to work and that she was totally disabled. But they found no justification in the record for that conclusion, particularly given the internal inconsistency of the objective medical notes. On the one hand, Dr. Stewart noted in 2012 that Smith's symptoms were intermittent and occasional, involving "mild spinning" and no nausea or vomiting, thus allowing her to perform full-time, sedentary work. On the other hand, in 2011 he highlighted her extreme nausea and inability to drive, opining that she should be placed on permanent disability. Dr. Harvey likewise stated on one occasion that Smith's frequent and severe migraines would limit her ability to work when suffering from an episode, but on another occasion clearly notes that Smith was capable of returning to full duty, sitting continuously, standing and walking occasionally, and working at a computer.

Recognizing contradictory assessments by Smith's treating physicians and identifying the paucity of objective support in the medical records is not "cherry-picking." Indeed, the internal inconsistency in Dr. Stewart's and Dr. Harvey's medical opinions renders Aetna's decision all the more reasonable. *See Ray v. Sun Life & Health Ins. Co.,* 443 Fed.Appx. 529, 533 (11th Cir.2011) (treating physician's "own office records and opinions are inconsistent internally and inconsistent with his conclusion that Ray is permanently disabled"). Dr. Stewart's conclusory note that "[the] patient should be on total disability," without objectively substantiating assessments, is insufficient to support Smith's claim of disability. His statement is contradicted by his accounts of her condition to peer reviewers during telephone consultations and his responses to explicit questions regarding her functionality. It was therefore reasonable for Aetna to place greater weight on the opinions of three independent physicians and the medical records. *Wilkins v. Sedgwick Claims Mgmt. Servs., Inc.,* 2010 WL 1837812, at *6 (M.D.Fla. May 3, 2010) ("conclusory finding by [treating physician] ... that the Plaintiff was 'disabled' ... cannot be said to require that a greater weight be given to his examination than those of the other consulting physicians"); *Blankenship v. Metro. Life Ins. Co.,* 644 F.3d 1350, 1356 (11th Cir.2011) ("Even where Blankenship's own doctors offered different medical opinions than MetLife's independent doctors, the plan administrator may give different weight to those opinions without acting arbitrarily and capriciously."); *Howard v. Hartford Life & Accident Ins. Co.,* 929 F.Supp.2d 1264, 1297 (M.D.Fla.2013) (insurer "acted reasonably in relying on the independent medical opinions, and in crediting those over the opinions of Howard's

doctors"); *Bates*, 2009 WL 2355834 at *16 ("insurer is entitled to weigh the conclusions of an insured's personal physicians against the conclusions of other professionals ... even when the opinions of the administrator's consulting physicians are based solely upon a paper review").

The Court is sympathetic to Smith's diagnoses and symptoms. Having spent many hours reviewing the administrative record, the Court has little doubt that Smith has for years suffered from vertigo, dizziness, nausea, migraine headaches, sporadic losses of consciousness, and hearing issues that result from her diagnosed Meniere's disease. But these diagnoses and even the presence of chronic symptoms are not sufficient, by themselves, to establish that a claimant is totally disabled. Multiple independent consulting physicians have concluded that her medical conditions are not totally disabling. In light of the medical documentation in the record, treating physician statements, independent paper-reviews, and peer consultations, Aetna's decision was reasonable. Smith has not shown that Aetna's denial was so wholly baseless that it was arbitrary and capricious.

## V. Conclusion

Defendant's motion for summary judgment [7] is granted. The Clerk is directed to close this case.