W. LOUIS SANDS, SR. JUDGE
Before the Court are cross Motions for Judgment on the Record pursuant to Fed.R.Civ.P. 52, filed by Plaintiff and Defendant on June 29, 2018. (Docs. 14 & 15.) Upon review of the administrative record, the arguments of counsel, and the relevant legal authorities, the Court hereby GRANTS Plaintiff's Motion for Judgment on the Record (Doc. 14) and DENIES Defendant's Motion for Judgment on the Record (Doc. 15).
PROCEDURAL BACKGROUND
Plaintiff Harry Knox brought this action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq. , against Defendant United of Omaha Life Insurance Company ("United") on September 29, 2017. (Doc. 1.) In his Complaint, Plaintiff alleges that Defendant denied his claims for long-term disability insurance benefits and asks the Court to award him those benefits with interest, as well as attorneys' fees and costs. Id. Plaintiff's claims are brought under ERISA's civil enforcement statute, 29 U.S.C. § 1132(a)(1)(B).
On June 15, 2018, as the discovery period was ending, the Court entered the Parties' Consent Order that "[t]he Court's review of the evidence in this case will be limited to the 'administrative record' " to be filed with the Court, and that the Parties would file dispositive motions with a supporting brief of no more than fifty pages in length based on that record by June 29, 2018. (Doc. 12.) The Court also agreed to "apply a de novo standard of review in reviewing the record and deciding the issues in this case." Id. at 2. Both Parties complied and each filed a Motion for Judgment on the Record. (Docs. 14 & 15.) Both Parties timely filed a response and reply. (Docs. 16, 17, 19, 20.) Defendant also filed the administrative record for the Court's review. (Doc. 13-1.) Accordingly, the cross Motions for Judgment on the Record (Docs. 14 & 15) are ripe for the Court's review.
LEGAL STANDARD
The Federal Rules provide that "[i]n an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately.... Judgment must be entered under Rule 58." Fed.R.Civ.P. 52(a)(1). Consistent with Fed.R.Civ.P. 52 and the previously-entered Consent Order (Doc. 12), the Court will apply de novo review in determining the facts and issues in this case.[1] Thus, the *1268 Court must determine de novo whether the claim administrator's decision to deny benefits was right or wrong. Lee v. BellSouth Telecomms., Inc. , 318 F. App'x 829, 835-36 (11th Cir. 2009) (citation omitted). The Court must "act as an insurance adjuster and substitute its judgement for the judgement of the claims administrator," "reviewing the evidence and making a determination on its own as to whether [the claimant] is entitled to disability benefits." Kinser v. Plans Admin. Committee of Citigroup, Inc. , 488 F.Supp.2d 1369, 1379 (M.D.Ga. 2007) ; Smith v. Cox Enterprises, Inc. , 81 F.Supp.3d 1366, 1378-1379 (N.D.Ga. 2015).
"ERISA has two central goals: (1) protection of the interests of employees and their beneficiaries in employee benefit plans, [ ]; and (2) uniformity in the administration of employee benefit plans." Horton v. Reliance Standard Life Ins. Co. , 141 F.3d 1038, 1041 (11th Cir. 1998) (citations omitted). Plaintiff has the burden of proving his entitlement to plan benefits. Acree v. Hartford Life & Accident Ins. Co. , 917 F.Supp.2d 1296, 1305 (M.D. Ga. 2013). If Plaintiff proves his claims by a preponderance of the evidence, the Court must determine that United's decision to deny him benefits was de novo wrong. Doyle v. Liberty Life Assur. Co. of Boston , 542 F.3d 1352, 1356-57 (11th Cir. 2008). If the Court makes that determination, it has discretion in fashioning an appropriate remedy, which may include reinstating benefits retroactively. Otero v. Unum Life Ins. Co. of Am. , 226 F.Supp.3d 1242, 1279 (N.D. Ala. 2017) ; Wagner v. American United Life Ins. Co. , 731 Fed.Appx. 495 (6th Cir. 2018).
FACTUAL FINDINGS
Pursuant to Fed.R.Civ.P. 52(a), the Court makes the following findings of fact.
From July 16, 2012 to May 2, 2016, Knox was employed as the CEO and President of Religious Coalition for Reproductive Choice ("RCRC"), a non-profit interfaith organization advocating for women's reproductive health rights and gay rights. (Doc. 13-1 at 892; Doc. 15-1 at 1; Doc 14-1 at 4.) Knox was covered under a group policy of disability insurance issued by Defendant as part of RCRC's employee welfare benefit plan. (Doc. 15-1 at 1; Doc. 14-1 at 1.) The insurance plan provides in relevant part:
Disability and Disabled mean that because of an Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred in which:
a) during the Elimination Period, You are prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and
b) after the Elimination Period, You are:
1. prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and
2. unable to generate Current Earnings which exceed 99% of Your Basic Monthly Earnings due to that same Injury or Sickness.
After a Monthly Benefit has been paid for 2 years, Disability and Disabled mean You are unable to perform all of *1269 the Material Duties of any Gainful Occupation.[2]
Disability is determined relative to Your ability or inability to work. It is not determined by the availability of a suitable position with the Policyholder....
Elimination Period means the number of days of Disability which must be satisfied before You are eligible to receive benefits. The elimination period is shown in the Schedule....
Material Duties means the essential tasks, functions, and operations relating to an occupation that cannot be reasonably omitted or modified. In no event will We consider working an average of more than the required Full-Time hours per week in itself to be a part of material duties. One of the material duties of Your Regular Occupation is the ability to work for an employer on a full-time basis.
...
Regular Occupation means the occupation You are routinely performing when Your Disability begins. Your regular occupation is not limited to Your specific position held with the Policyholder, but will instead be considered to be a similar position or activity based on job descriptions included in the most current edition of the U.S. Department of Labor Dictionary of Occupational Titles (DOT). We have the right to substitute or replace the DOT with another service or other information that We determine to be of comparable purpose, with or without notice. To determine Your regular occupation, We will look at Your occupation as it is normally performed in the national economy, instead of how work tasks are performed for a specific employer, at a specific location, or in a specific area or region....
Sickness means a disease, disorder or condition, including pregnancy, that requires treatment by a Physician. Disability resulting from a sickness must occur while You are insured under the Policy. Sickness does not include elective or cosmetic surgery or procedures, or resulting complications. Sickness includes the donation of an organ in a non-experimental organ transplant procedure. (Doc. 13-1 at 130-133.)
Prior to working for RCRC, Knox served as a senior pastor in Houston, TX and was also appointed by President Obama to serve as a member of the Advisory Council for the White House Office of Faith-Based and Neighborhood Partnerships. (Doc. 13-1 at 389-90.) He holds a Master's Degree in Divinity. Id. at 389. As CEO of RCRC, his "regular occupation," Knox was responsible for implementing many of the goals of RCRC and managing key components of the organization, including its financial and funding programs, board relations and leadership, and public relations. Id. at 152. Knox was "integral in the fundraising, policy advocacy, national communications, and leadership and coordination of a diverse national board of directors." Id. Knox worked as "a fundraiser, educator, public speaker, conference leader, lobbyist and pastor." Id. at 390. Knox's occupation required him to travel frequently, approximately two to three weeks per month. Id. To reduce costs, he sometimes traveled on multi-leg trips lasting several hours each way. Id. He traveled to Washington D.C. about thirty times each year for meetings and to testify before Congress, when he would often take trains and walk significant distances.
*1270 Id. He would carry educational materials and handouts in his luggage which often weighed more than twenty-five pounds. Id. He would stand for hours when speaking with legislators, lobbyists, congressional staff, and the media. Id. He would give television and radio interviews about twice per month. Id. His position required excellent communication and public speaking skills, as well as strong analytical and cognitive abilities. See id. He conducted trainings which could last two to three days each, served as a visiting minister at churches and synagogues once a month, attended rallies once a month, and often performed outreach services in other communities. Id. It was normal for Knox to work ten to twelve-hour workdays. Id. He worked in an office about ten days per month, where he performed administrative tasks such as preparing and reviewing documents and speaking with board members and staff. Id. at 391.
Knox was diagnosed with HIV in 1986 and has received numerous treatment regimens over the years. (Doc. 13-1 at 327.) Knox has had AIDS for many years. Id. He was able to work and function at a high capacity until approximately 2014 when he was diagnosed with essential tremors and also began having memory and anxiety problems. Id. Knox also was diagnosed with hypertension and has had depression since his teenage years, which had generally been managed by medication. (See id. at 327 & 559.) After the onset of his hand and head tremors, Knox began experiencing cognitive and emotional difficulties, including increased irritability, increased depression, memory problems, sleep disturbances and insomnia, and difficulty concentrating and speaking. (Doc. 13-1 at 559-60.) Knox took a medical leave of absence beginning on November 15, 2015. Id. at 559. In February 2016, Knox submitted a Short-Term Disability Claim Form to Defendant indicating that his disability began on January 28, 2016 and that he was first treated on January 28, 2016. Id. at 90. Dr. Mahmoud Mustafa listed Knox's sickness as HIV dementia and his symptoms as difficulty concentrating, poor memory, and poor comprehension. Id. at 94. Defendant paid Knox short-term disability benefits through the maximum duration of eleven weeks through April 27, 2016. Id. at 49.
Meanwhile, on April 21, 2016, RCRC sent a Staff Performance Evaluation of Harry Knox to United for the period of January 2014 to June 2015. (Doc. 13-1 at 892). The evaluation was dated July 9, 2015. Id. Knox was rated with mostly 3s and 4s out of 5 and received positive and negative comments-negative comments included concerns that RCRC was "not making significant or measurable progress" in 2014, "a need to improve routine communications" in 2014, "concerns about financial reporting," and concerns about "conflicts between CEO and staff." Id. at 892-97. Knox stated during a neuropsychological evaluation that problems arose at work in 2013 when he "hired a group of people who did not work well together" and then had to fire those people and hire a new group of people. Id. at 723. Staff then "questioned his decision-making ability and memory issues" and "basically demanded that he leave." Id. Knox's employment was terminated on May 31, 2016. Id.
As to the extent and cause of Knox's ailments, the facts are contested. While some people observed significant illness and cognitive decline in Knox, others found that he appeared to function normally. This could be because Knox "has good days and bad days." (Doc. 13-1 at 724.)
Two independent consultants to RCRC from August 2014 to December 2015 provided a declaration detailing their observations of Knox's performance. Id. at 265.
*1271 They state that while in 2014 Knox was "a quiet yet charismatic leader, with creative ideas for the future of the organization, and a knack for seeing strategic opportunities," in 2015 he experienced a complete decline such that he could no longer serve as CEO. Id. They state that in 2015, they observed Knox's memory and cognition deteriorate such that he forgot meetings and conversations, flew to Cleveland instead of Washington D.C. for an in-person meeting, and could no longer understand, let alone explain, RCRC's finances and programs to board members. Id. He became "easily disoriented and confused" and even fainted on the way to at least two meetings. Id. He would forget decisions that he had previously made and "became less able to communicate his thoughts clearly." Id at 266. The consultants describe Knox's decline as "heartbreaking" and recommended that he take a medical leave "as a graceful pathway to stepping down as CEO." Id.
There are other objective indicators that Knox's HIV had progressed by the time of his alleged disability. While a healthy person has a CD4 (T-cell count) of 500 cells/mm to 1,600 cells/mm, Knox's CD4 count was below 200 cells/mm at least since late 2015 despite taking anti-viral medications. (Doc. 13-1 at 204, 367-8, 373, 377.) Similarly, while a viral load count above 20 copies/ml indicates viral infection, Knox's viral load count in January 2016 was 584 copies/ml. (Id. at 372.)
Nonetheless, Knox's health appeared to vary in 2016. At his January 28, 2016 appointment, Knox complained of depression, insomnia, that he had been "really sick" for 48 hours per week for the last six weeks, that he was coughing and sneezing a lot but was not sure if it was weather changes or allergies, and that movement made his symptoms worse. (Doc. 13-1 at 354.) Knox also inquired about going on long-term disability. Id. Dr. Mustafa examined Knox and concluded that Knox had no nasal discharge or throat inflammation, that he had full range of motion, that his motor functions were normal and of full expected strength with no tremor, that his speech and comprehension were normal, that his recent and remote memory were intact, and that he had good judgment and ordered thought processes. Id. at 356. Dr. Mustafa found that Knox's HIV was "stable" and that he suffered from an "unspecified mental disorder due to known physiological condition." Id. at 358. In May and November 2015, Dr. Mustafa also found that Knox's HIV was "stable" and did not diagnose any specific cognitive disorder. Id. at 361 & 363. However, in recommending that United place Knox on short-term disability, Dr. Mustafa stated that he had diagnosed Knox with HIV dementia in January 2016. (Id. at 94.)
Thereafter, in April 2016, Knox stated that he could drive and perform daily activities like gardening and housekeeping. Id. at 723, 948. In June 2016, during a neuropsychological evaluation with United-retained Dr. DeFillipis, Knox stated that he went on medical leave in October 2015 due, at least in part, to his husband's spinal injury. (Doc. 13-1 at 723.) Knox's husband is "almost fully disabled" and has been out of work since 2007. Id. at 726. The loss of Knox's income "has been devastating." Id. at 269. Dr. DeFillipis found that Knox "did not present as being particularly depressed or anxious" and "[t]here was no indication of a thought disorder." Id. at 727. Knox provided a transcript of an interview he had done on oral history which he thought showed his difficulty answering questions, but Dr. DeFillipis "did not see any obvious signs" that Knox had difficulty answering questions. Id. Dr. DeFillipis performed a number of tests on Knox and concluded that Knox was "overreporting his cognitive and psychological problems, and there may be some conscious *1272 embellishment of these symptoms." Id. at 728. In other areas, Dr. DeFillipis concluded that Knox performed well overall, had a "high average IQ," did not have a memory or attention impairment, and that his mild weakness in processing speed was likely "related to factors other than neurological issues .... most likely emotional issues and possibly the examinee's belief that he is cognitively impaired." Id. at 732. Dr. DeFillipis also observed a mild tremor in Knox's left hand during the Finger Tapping Test, such that the test was stopped after four trials. Id. at 802. Dr. DeFelippis opined that Knox "believes he is far more impaired than he actually is" and that his perceived impairments were likely due to the problems he encountered in his last job and "inability to maintain his position as a pastor." Id. at 734. Dr. DeFillipis did not see any evidence that Knox suffered from HIV dementia. Id. Dr. DeFillipis concluded that Knox may benefit from psychotherapy but that therapy would not be necessary to perform the tasks of his previous work position. Id.
On July 18, 2016, United denied Knox's application for long-term disability benefits, concluding that based on the documents provided by Defendant, physicians, and RCRC, Knox was not disabled and not entitled to long-term disability benefits. (Doc. 13-1 at 753-757.) United noted that it had asked Dr. Mustafa to provide any agreement or rebuttal to Dr. DeFillipis' report, but Dr. Mustafa did not respond. Id. at 755, 790. Knox appealed the denial in January 2017. (See id. at 1007-1009.)
Knox obtained additional reports and documents to support his appeal. Nurse Practitioner Lori Tomlinson who had been managing Knox's AIDS in Georgia since May 2016 wrote that three months after giving Knox anti-viral medications, his CD4 count remained at 125, which was "clinical evidence of significant disease progression." (Doc. 13-1 at 198.) Ms. Tomlinson wrote that Knox "remains immunocompromised" and that his appearance and walk are that of a much older man, that he needs a cane to walk, and that he appears as someone who is "very fragile." Id. She has consistently observed his arm and hands tremor as someone with Parkinon's disease and has also observed clinical signs of cognitive decline consistent with AIDS-related dementia. Id. She observed that his speech was slow, he could not remember words, often lost his train of thought, and could not remember recently prescribed medication even with the help of his partner. Id. She opined that he could not perform any job that required mental acuity and that his immune system was so depleted that he was "at high risk for infection which for him could prove fatal." Id. at 199. She found Knox's presentation credible and "consistent with his advanced AIDS disease process." Id. Similarly, a vocational expert's report prepared in April 2017 opined that Knox's limitations "will preclude work in his usual occupation or any other occupation." Id. at 394.
Dr. Eisa, who became Knox's treating neurologist in Georgia, found that Knox suffered from a "mild cognitive impairment" which would interfere with his ability to perform his job. (Doc. 13-1 at 411.) Dr. Eisa also found that Knox had an abnormal brain MRI which indicated that his hippocampus had atrophied to "just 52% of normal size," consistent with AIDS-related dementia. Id. Dr. Eisa said this would affect his memory and cognitive functioning. Id. Dr. Eisa also observed lesions on Knox's brain which would cause tremors and affect Knox's motor skills, and that the increase in lesions showed "that his disease is progressing." Id. at 412. Dr. Eisa concluded that Knox's "reported symptoms and impairments are genuine," that Knox was "unable to work through an 8 hour day in any capacity on a reasonable *1273 basis," and that his condition was "likely to deteriorate over time consistent with the known disease process." Id. at 413.
The Social Security Administration ("SSA") and its medical consultant, Dr. Schiff, concluded that Knox had cognitive decline due, at least in part, to his subcortical HIV dementia and that his MRI scan was abnormal and indicated disease progression. (Doc. 13-1 at 422-23.) Dr. Schiff described Knox's impairment of Symptomatic HIV as "severe." Id. at 423.
Similarly, Knox's husband, C. Michael Bozeman, describes a severe decline in Knox's abilities as of 2017. (Doc. 13-1 at 268.) Although Bozeman was severely injured in a car wreck in 2007, he states that the roles have been reversed and he now takes care of Knox. Id. Bozeman writes that Knox can no longer remember names, telephone numbers, or the car door combination though they have owned the car for years. Id. He writes that Knox is not allowed to drive because he gets lost easily in the small town they moved to in South Georgia to be near their families. Id. Knox no longer attends church, will not go to stores alone, often forgets his wallet and keys, and has to be encouraged to eat, bathe, and get out of bed. Id. at 268-69.
United also received another neuropsychological report dated December 5, 2016 which indicated "impairment in the areas of visual and sustained attention, fine motor speed, and complex problem-solving." Id. at 1007-1008. United concluded that Knox was disabled beginning December 5, 2016 due to those observed cognitive deficits, but that he could perform the requirements of a sedentary occupation and would only need restrictions from prolonged standing or walking. Id. at 1007. United concluded that because his cognitive deficits were not detailed or apparent prior to that date, he was not continuously disabled since the time he asserted his disability began in January 2016. Id. United noted that MRI results did not support a diagnosis of dementia and that Dr. Stoute did not see evidence showing hippocampal atrophy. Id. United concluded that the denial of Knox's claim for long-term disability benefits should, therefore, be upheld. Id. United informed Knox's attorney on June 8, 2017 that the denial was upheld. Id.
CONCLUSIONS OF LAW
Pursuant to the insurance plan, Knox was disabled if:
(1) because of a Sickness, "a significant change in [his] mental or physical functional capacity" occurred, such that
(2) during the Elimination Period, he was "prevented from performing at least one of the Material Duties of [his] Regular Occupation on a part-time or full-time basis;" and
(3) after the Elimination Period, he was also "prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and unable to generate Current Earnings which exceed 99% of [his] Basic Monthly Earnings" due to that same Sickness. (See Doc. 13-1 at 130.)[3]
As to the first prong, the Court is persuaded by a preponderance of the evidence that Knox suffered a significant change in his mental and physical functional capacity because of his HIV/AIDS. The evidence is undisputed that Knox had HIV and that his CD4 and viral counts were so *1274 significantly different from that of a healthy person that his health was severely impacted at least by the time he claimed his disability began in January 2016. (Doc. 13-1 at 204, 367-8, 372-73, 377.) Dr. Mustafa also noted specific physical and mental decline during 2015, which included: "impaired attention" in March 2015 and depression and inability to make decisions in May 2015. Id. at 361-62, 365. The declaration of consultants who worked directly with him in the two years before he was fired was demonstrative: Knox had clearly suffered such a significant deterioration of his physical and mental capacity that he would literally faint while walking to meetings and be confounded by basic information essential to his job. Id. at 265.
The Court must next determine whether Knox was unable to perform at least one of the Material Duties of his Regular Occupation during and after the Elimination Period. The Elimination Period is, in this case, the 90 days after he applied for short-term disability on January 28, 2016. (See Doc. 13-1 at 111.) The Court finds persuasive the conclusions of Vocational Expert Dian Haller (Doc. 382-97) and finds that Knox's regular occupation consisted of managing the organization and fundraising, which required complex intellectual analysis, strong problem-solving skills, public speaking, mild physical demands, and fine motor skills. See id. at 125; 391-394. The physical limitations alone rendered Knox "not capable of performing the material duties" of his job, and combined with the cognitive impairments, "preclude[d] work in his usual occupation or any other occupation." Id. at 394.[4] Although United argues that Knox's mental status exams were normal until December 2016 (Doc. 15-1 at 29-31), the record shows otherwise. While it is not entirely clear how well Knox previously responded to his anti-viral medications, by 2015, Knox's body was resistant to the medication as his CD4 count remained low throughout 2015, 2016, and into 2017. See id. at 198, 327, 329, 335, 338-39, 342, 355, 359, 363. This, along with his other symptoms, were consistent with significantly progressive degeneration from AIDS. See id. at 198-99.
The mental challenges Dr. Mustafa noted in the first half of 2015 persisted during and after the elimination period. By the fall of 2015, the consultants who had previously admired Knox's work recommended that Knox go on short-term medical leave and eventually step down. Id. at 266. There is little evidence of Knox's condition in the first three months of 2016 because Knox was on leave and then moved to Georgia. However, that Dr. Mustafa did not describe specific symptoms of cognitive deterioration in Knox's final two appointments is not determinative- Dr. Mustafa in fact stated that Knox had a "mental disorder due to known physiological condition," which could certainly be interpreted consistently with his express diagnosis in January 2016 that Knox had HIV dementia. Id. at 353, 358, 94. Then, in May 2016, Knox met with Ms. Tomlinson for AIDS management and described similar, ongoing symptoms, including fatigue, anxiety, depression, weakness, and short-term memory loss.[5] Id. at 328. At that time, Knox had not had an MRI in 3.5 years, so Ms. Tomlinson referred him to a neurologist.
*1275 Id. at 329. The subsequent MRIs on July 12, 2016 and October 4, 2016 clearly showed abnormalities on Knox's brain.[6] Id. at 411. Several doctors observed lesions, or "white matter," on Knox's brain representing microvascular ischemia which could contribute to memory loss and cognitive decline. Id. at 388, 411, 562, 572. The MRIs revealed "disease progression" and new lesions over time. Id. Although Dr. DeFillipis opined that Knox perceived himself to be more disabled than he actually was,[7] numerous doctors and experts found Knox's presentation credible and concluded that he was genuinely suffering from AIDS-related dementia, e.g., Dr. Mustafa, Dr. Eisa, Ms. Tomlinson (and Dr. Saurina), Vocational Expert Haller, Dr. Sass, Dr. Yasin, and Dr. Schiff (along with the SSA). See , e.g. , id. at 198, 384-88, 394-97; Otero v. Unum Life Ins. Co. of Am. , 226 F.Supp.3d 1242, 1276 (N.D. Ala. 2017) (finding persuasive plaintiff's treating physician's opinion that plaintiff could not work full-time); Rease v. KPMG LLP , No. 1:02-CV-797-ODE, 2003 U.S. Dist. LEXIS 28991, at *7 (N.D. Ga. Sep. 26, 2003) (finding plaintiff disabled from the physical disease of HIV based on numerous physicians' conclusions to that effect despite two consultants disagreeing that plaintiff had HIV-related dementia ).
Indeed, United itself conceded that Knox was disabled as of December 5, 2016, after receiving a neurological report from Drs. Sass and Yasin. (Doc. 13-1 at 557-75, 1007.) The seventeen-page report detailed a host of cognitive and physical limitations: low average motor function in right hand and mildly impaired in left hand, tremor in hands and head, sustained visual attention not within normal limits, ability to problem-solve mildly to moderately impaired, severe depression, mild to severe anxiety, emotional and physical symptoms consistent with a longstanding diagnosis and management of HIV, and confusion with verbal memory abilities. Id. at 565-573. The report indicated that there was no apparent symptom exaggeration and was valid. Id. at 566, 571. Drs. Sass and Yasin concluded that while it was possible that Knox suffered from HIV-related dementia and/or microvascular ischemic changes of the brain because his symptoms of depression, tremors, and decreased cognitive functioning were consistent with those disorders, they diagnosed Knox with "Unspecified Neurocognitive Disorder," Major Depressive Disorder, and HIV Infection. Id. at 572-73. They stated that given his decreased cognitive functioning, emotional distress, and essential tremor, Knox could not likely return to his prior occupation. Id. at 573-74. Although United persistently argues that "plaintiff's condition had changed by November 2016," the Court is unpersuaded, based on the record, that a degenerative disease like AIDS suddenly manifested into a disability in November 2016 but at no time prior. (Doc. 17 at 7.)[8]
*1276 As has been held, "some diseases - such as ... AIDS [ ] are manifested by a progression of intermittent symptoms, and [ ] the intermittent nature of those symptoms does not mean that the disease does not constitute a disability." EEOC v. Autozone Inc. , No. 07-1154, 2009 WL 10685021 at *2, 2009 U.S. Dist. LEXIS 138097 at *6 (C.D. Ill. Dec. 14, 2009) ; Vande Zande v. Wis. Dep't of Admin. , 44 F.3d 538, 544 (7th Cir. 1995) ("The AIDS virus progressively destroys the infected person's immune system.").
The December 2016 report was consistent with the portended worsening of Knox's AIDS symptoms as described by his treating medical providers and was persuasive evidence that Knox was not exaggerating symptoms in June 2016, but was more likely than not experiencing a genuine and significant decline of his mental and physical functions. (See Doc. 13-1 at 413.) The report was consistent with a November 22, 2016 evaluation indicating that Knox's physical demand level was "below sedentary to disabled." Id. at 384. The report was consistent with Dr. Eisa's June 2016 opinion that Knox's tremors were so bad that he could not eat and his July 19, 2016 conclusion that Knox "definitely has cognitive decline." Id. at 385. It was consistent with Dr. Mustafa's diagnosis of "unspecified mental disorder" in January 2016 and symptoms of poor memory and poor concentration. Id. at 60, 94. In fact, the report was consistent with Knox's husband's and coworkers' observations and his own repeated complaints of memory loss, difficulties with comprehension and communication, and overall physical and cognitive deterioration in 2015 and 2016 such that he was unable to continue working as CEO of RCRC in January 2016. Finally, no one disputes and the record further shows, that Knox was unable to generate current earnings after the elimination period. See id. at 130. Accordingly, the Court finds on de novo review that United's decision that Knox was not disabled was wrong. The Court concludes that Knox was disabled during and after the elimination period as defined in United's insurance policy and is due long-term disability benefits pursuant to that policy. See Horton v. Reliance Standard Life Ins. Co. , 141 F.3d 1038, 1042 (11th Cir. 1998) (affirming district court's decision to grant benefits where the trial judge "was not persuaded by the defendant's [speculative] evidence").
Generally, where the plan administrator's decision was unreasonable and there are no factual determinations to be made, the proper remedy is to retroactively reinstate benefits. Williams v. Int'l Paper Co. , 227 F.3d 706, 715-16 (6th Cir. 2000) ; Godfrey v. BellSouth Telecoms. , 89 F.3d 755, 757 (11th Cir. 1996) (affirming district court's award of benefits under ERISA). However, Defendant argues that the case must be remanded because it was not able to determine whether Plaintiff was disabled from "any gainful occupation" after the initial twenty-four months of his disability and nor able to determine if disability benefits should be capped based on its policy pertaining to mental disorders.[9] (Doc. 17 at 18-19.) Defendant cites as authority another order issued in the Middle District of Georgia where the district judge ordered defendant to pay the "own *1277 occupation" benefits and remanded to defendant to determine whether plaintiff was disabled from "any occupation," tolling any applicable statute of limitations. Adams v. Hartford Life & Accident Ins. Co. , No. 4:08-CV-53 (CDL), 2010 WL 2197173 at *3, 2010 U.S. Dist. LEXIS 53382 at *7 (M.D. Ga. June 1, 2010). Plaintiff, however, cites a recent Sixth Circuit case where the court ordered defendant to pay benefits to-date, finding that defendant had made no determination that plaintiff was not eligible under the stricter "total disability" standard. Wagner v. Am. United Life Ins. Co. , 731 F. App'x 495, 498 (6th Cir. 2018) (awarding all benefits missed where defendant "chose to forgo" the opportunity to determine whether plaintiff was totally disabled from any occupation "when it (wrongly) decided that Wagner was no longer entitled to benefits"). But this Court is not bound by the Sixth Circuit, and in any event, finds it prudent to allow United the first opportunity to determine whether Knox is due benefits beyond the initial twenty-four-month period especially because here, unlike in Wagner , United denied long-term benefits only six months after Knox applied. See Byars v. Coca-Cola Co. , 517 F.3d 1256, 1263-67 (11th Cir. 2008) (vacating district court's judgment and remanding where defendant did not seek summary judgment under the "any occupation" definition and had never decided whether plaintiff was entitled to benefits under the "any occupation" definition).[10]
CONCLUSION
Accordingly, it is hereby ORDERED and ADJUDGED , that:
1. Plaintiff's Motion for Judgment on the Record (Doc. 14) is GRANTED , and Defendant's Motion for Judgment on the Record (Doc. 15) is DENIED ;
2. Defendant shall pay Plaintiff the balance of benefits owed for twenty-four months based on Knox's inability to perform his "Regular Occupation" and interest on those benefits;
3. Plaintiff shall submit a motion for attorneys' fees and costs no later than Tuesday, February 19, 2019 , to which Defendant may respond no later than Tuesday, March 5, 2019 ; alternatively, by the same date, Plaintiff may submit a motion for an extension of time;
4. The Court REMANDS the case so Defendant may determine whether Plaintiff is due additional benefits beyond the initial twenty-four-month period, and any applicable statute of limitations shall be tolled pending Defendant's decision on that issue; and
5. The Clerk of Court is DIRECTED to enter judgment for Plaintiff consistent with this Order.
SO ORDERED , this 30th day of January 2019.

The Supreme Court has held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch , 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Because the Parties stipulate that the plan at issue here did not give Defendant such authority (Doc. 12 at 2), a de novo standard of review is appropriate.

Because Plaintiff's claim was denied before two years, the Court need not determine whether Knox could perform all of the Material Duties of any Gainful Occupation. (See Doc. 14-1 at 44; Doc. 15-1 at 4 n.2.)

The Court notes that any technicalities in construing these terms should not work against Knox because such "terms should be construed in favor of employees to whom promises are made." Brown v. Blue Cross & Blue Shield, Inc. , 898 F.2d 1556, 1569-70 (11th Cir. 1990).

Thus, even if Knox's regular occupation were considered solely sedentary, his impairments would still preclude him from such work. See Cook v. Standard Ins. Co. , No. 6:08-cv-759-Orl-35DAB, 2010 U.S. Dist. LEXIS 44778, at *24-25 (M.D. Fla. Feb. 16, 2010) (explaining that insurance adjusters can rely on the DOT's classification exclusively).

The Court finds it significant that Knox reported consistent symptoms and that these symptoms gradually worsened over time. See also id. at 331, 334, 337, 342-44.

This is so notwithstanding the difference of opinion about the volume of Knox's hippocampus. The Court is not necessarily persuaded by Dr. Eisa's lone opinion that Knox's hippocampus had shrunk 52% as no other doctors appeared to share the same opinion. See id. at 562.

Notwithstanding Dr. DeFillipis' subjective opinions, his tests revealed a left-hand tremor and slow processing speed in Knox. See Doc. 13-1 at 793-802.

(See also Doc. 17 at 19-20) ("[H]e has presented evidence tending to establish that he was disabled from his occupation in late 2016, a proposition not contested by United."). Furthermore, Defendant's argument made for the first time in its reply brief that Plaintiff suffered a sudden event, possibly a stroke, in August 2016 resulting in left-sided weakness does not change the Court's findings. Not only does no doctor state that Knox suffered a stroke, but the record shows that Knox's tremors and numbness had occurred most often in his left hand before the summer of 2016. (See , e.g. , Doc. 13-1 at 797, 802); Otero , 226 F.Supp.3d at 1276 (finding persuasive doctor's statement made almost one year after alleged onset of disability that plaintiff's condition had worsened over time).

United's policy limits disability payments to twenty-four months when the disability is due to a mental disorder. (Doc. 1007 at 122.)

To be clear, United has also not determined whether Plaintiff is disabled by a "mental disorder," and remand is further appropriate because neither party has argued that issue before the Court.